**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08 CR 411** |
| | ) | |
| **ABDERRAHMANE KHELLIL** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

On June 4, 2008, a grand jury indicted Abderrahmane Khellil on two counts of making false statements in violation of 18 U.S.C. § 1001(a)(3).  The indictment alleged in Count 1 that on June 4, 2003, Khellil knowingly made false statements in a Form I-485 Application to Register Permanent Residence or Adjust Status, submitted to the Department of Homeland Security, Immigration and Customs Enforcement (ICE), "that his place of last entry into the United States was Maryland, that his date of last arrival was December 2, 1998 and that he was not inspected by a U.S. Immigration Officer." The indictment alleged in Count 2 that on July 16, 2007, Khellil  knowingly made false statements in a form AR-11 Alien's Change of Address Card "that his place of last entry into the United States was Maryland and that his date of entry into the United States was December 28, 1998."

The case was tried before a jury in late June 2009.  Khellil was represented by retained counsel.  The jury was instructed, without objection by either side, that to convict Khellil on Count 1, the government had to prove the following beyond a reasonable doubt:

1. The defendant knowingly made a false statement regarding his place of last entry into the United States, his date of last arrival, and/or whether he was inspected by a U.S. immigration officer.
2. The statement involved a matter within the jurisdiction of the Department of Homeland Security.
3. The statement was material.
4. The defendant acted willfully.

As to Count 2, the jury was instructed that the government had to prove the following:

1. The defendant knowingly made a false statement regarding his place of last entry into the United States and/or his date of entry into the United States.
2. The statement involved a matter within the jurisdiction of the Department of Homeland Security.
3. The statement was material.
4. The defendant acted willfully.

Jury Instructions (dkt. no. 79) at 14-15. The jury was instructed that "[a] statement is material if it had the effect of impeding, interfering with, or influencing the Department of Homeland Security in a matter the agency was considering, or if the statement had the potential or capability to do so." *Id.* at 16. The jury was also told that as to each count, it had to agree unanimously on the particular false statement(s) that formed the basis for a guilty verdict. *Id.* at 17.

The jury convicted Khellil on both counts. Because of the Court's concerns regarding the adequacy of his legal representation before and during the trial – a matter the Court will discuss in greater detail below – the Court made a Federal Defender Panel attorney available to Khellil in connection with post-trial motions.

Khellil's trial counsel filed a motion for a judgment of acquittal and was then granted leave to withdraw. The Federal Defender Panel attorney thereafter filed a motion for a judgment of acquittal or in the alternative for a new trial. The Court deals with both motions in this decision.

2

**Pretrial proceedings and the trial**

The Court begins by summarizing the evidence and other matters relevant to the present motions.

Prior to trial, the Court granted the government's motion *in limine* to admit a web page purportedly from a business owned by Khellil, subject to laying a proper foundation. The Court denied a motion by Khellil to preclude the government from introducing photographs of "Marco Lubrano," under whose name the government contended Khellil had entered the country. Khellil had argued that the photographs could not be the basis of a reliable identification. The Court precluded the government, however, from eliciting testimony from any of its witnesses comparing the Lubrano photos to Khellil. The Court also granted a motion *in limine* by Khellil to preclude testimony that someone who allegedly traveled to the U.S. with him used a false passport.

At trial, Salija Cobalovic testified that she worked as a janitor in an apartment building located on North Kedvale Street. Sometime during 2004, she found a plastic bag behind a stove in apartment 2D at 4207 North Kedvale. The bag contained a driver's license, which she took to the office of the apartment's management company, Hunter Properties. She had no knowledge of who had lived in the apartment.

Russell Pavlock, a vice president of Hunter Properties, testified that Cobalovic brought a bag with licenses or identification cards to the company's office. She gave them to company's president, who gave them to law enforcement. Pavlock conceded that he had never seen the licenses. The management company's records reflected that Abderrezak Khellil (identified by a later witness as the defendant's brother) lived at

4207 North Kedvale, apartment 2D, from December 2000 through October 2004. The company no longer has a copy of the lease for the apartment. Its records did not reflect any roommates or others living in the apartment with Abderrezak. Pavlock said, however, that did not necessarily mean that no one else lived there.

Richard Lyons, an ICE special agent, also testified. He first learned about Khellil from a source who said that Khellil was from Algeria and was operating a restaurant called Zam Zam Banquet Hall. Lyons obtained public records regarding the restaurant and learned that its officers were Abderrahmane and Abderrezak Khellil and a third man. Lyons testified that Hunter Properties produced to law enforcement a commercial driver's license and Social Security card in the name of Marco Lubrano. Lyons stated that he "received [the documents] from another federal agent on the participating task force that I was working on." Trial Tr. 69.

When the government moved the identification records into evidence, defense counsel objected on the ground that the government had not shown a proper chain of custody. The Court called a sidebar. The prosecutor argued that chain of custody is a matter affecting weight to be given to evidence of this type, not admissibility. She stated that Hunter Properties had provided the records to law enforcement and that Lyons had testified that he had received the records. The Court asked the prosecutor "[w]hat's the other agency?," referring to the "other federal agent on the participating task force" to whom Lyons had referred in his testimony. The prosecutor stated that it was the "joint terrorism task force unit," stating "that's why I did not bring it up, because I felt that was not fair." Trial Tr. 71. The Court concluded that a sufficient chain of custody had been established and admitted the records in evidence. (The Court notes

4

that no evidence was offered or admitted, nor was there any hint, that Khellil had or has

any involvement with terrorist activity or terrorist groups.  Nor has the government

suggested anything of the sort at any point in time.)

Lyons testified that he requested information from ICE headquarters regarding

Algerians who had applied for asylum and at some point linked Marco Lubrano and

Abderrahmane Khellil.  He requested the immigration files on Khellil.  Khellil's "A file"

reflected that he had filed an asylum application (Form I-589) in San Francisco,

California in or about October 1999.  The application reflected that it had been prepared

on Khellil's behalf by a San Francisco attorney.

The Court notes that the asylum application was not one of the documents in

which Khellil was charged with making false statements – likely because the statute of

limitations had long since run by the time Khellil was indicted.  The asylum application

included the following questions and answers:

> When did you last leave your country?
> (Mo/Day/Yr)
> 12-2-98
>
> When did you last enter the U.S.?
> (Mo/Day/Yr)
> c. 12-28-98
>
> Where did you last enter the U.S.?
> Maryland
>
> What was your status when you last entered the U.S.
> (What type of visa did you have, if any)?
> without inspection

Govt. Ex. ICE 2 at 16.  The application and testimony reflected that during Khellil's

interview by an immigration officer, the officer wrote in the word "Baltimore" next to the

reference to Maryland and wrote in, next to the statement "without inspection," the following: "smuggled aboard a ship w/o P.P. or visa." *Id.*

Documents accompanying the asylum application reflected that Khellil claimed he had opened a shop in Algeria in August 1997 and, starting in July 1998, was threatened and harassed by members of the Armed Islamic Group and fled Algeria for that reason. Khellil answered "no" to a question regarding whether he had previously entered the United States. In response to a question regarding previous addresses, Khellil listed addresses in San Francisco (for January 1999 through the application date) and Algeria, but no Chicago-area addresses. The documentary evidence reflected that Khellil's asylum application was granted in or about February 2000.

Lyons testified that Khellil's "LIN" file, maintained at the immigration offices in Lincoln, Nebraska, included an application to adjust status (Form I-485), in which Khellil sought permanent resident status. The application reflected that it was filed with the INS in early June 2003. This was the document that was the subject of Count 1 of the indictment. On the form, Khellil listed his "date of last arrival" as December 2, 1998 and his "place of last entry into the U.S." as Maryland. The former entry was typed into the application; the latter was handwritten by someone not identified in the evidence presented at trial. The form listed Khellil's current address as 4207 North Kedvale, apartment 2D, Chicago – the apartment where the Marco Lubrano driver's license had been found.

Khellil's LIN file also included an "alien's change of address card" (Form AR-11) that he submitted to U.S. Citizenship and Immigration Services (USCIS), dated July 16, 2007. This was the document that was the subject of Count 2 of the indictment. On

6

this form, Khellil listed his "port of entry into U.S." as Maryland and his "date of entry into U.S." as December 28, 1998.  The Court notes that the evidence did not reflect that either Khellil's I-485 application or his asylum application was still pending when he submitted the Form AR-11; both were adjudicated years before that.

Lyons testified that he compared photos of Khellil and Marco Lubrano and then continued his investigation.  He obtained records and ran computer queries, the results of which were introduced in evidence.  Lyons ran a computer query for the immigration and customs authorities' entry and exit records for Marco Lubrano and for Khellil, for the years 1982 through 2008.  These records reflected an entry into the country by Marco Lubrano, an Italian citizen, on December 20, 1993 at Chicago via a "visa waiver"; no departures from the U.S. by Lubrano; and no entries or exits by Khellil.  Lyons also testified that records shows that Khellil's mother entered the United States on May 16, 1997 from Algeria and reported that she would be living at 4327 North Kedvale, an address he recognized from "source information" as connected to Khellil and from Illinois Secretary of State records as connected to Lubrano.

Lyons also testified that he ran a Google search for Zam Zam Banquet Hall and located a web page including a photo that he testified appeared to be a photo of the defendant. The web site referred to "Chef Khellil" as having come to the U.S. from Italy and having over fifteen years of experience, which corresponded with the date of the entry of "Marco Lubrano" into the U.S.

Lyons also obtained records from the City of Chicago relating to a 1994 application by Marco Lubrano for a taxicab license.  The records included a fingerprint card listing the same date of birth for Lubrano as the one on the driver's license found

in the North Kedvale apartment.  Lyons also obtained Khellil's fingerprints taken by the

U.S. Marshal after his arrest in this case and forwarded both sets of fingerprints to the

ICE forensic laboratory.  Lyons also testified that he observed Khellil prepare

handwriting exemplars, which he then forwarded to the ICE laboratory.

On cross examination, defense counsel pressed Lyons about the nationalities of

the individuals he had been investigating and then asked pointedly why Lyons was

interested in Algerians.  The Court became concerned at this point that defense

counsel's inquiry might elicit a reference to the "joint terrorism task force" that the

prosecutor had mentioned at the sidebar during Lyons' direct examination.  The Court

called a sidebar and stated:

> THE COURT:  . . . based on the side bar we had earlier . . ., my concern
> is that you're walking down a road here which is going to result in the
> witness, you know, mouthing what we would call the T word . . . .  You
> asked a question which I suspect the witness could have legitimately
> answered using that, and so you're skating on thin ice.  You've got to be
> more careful. . . .  When you ask somebody why you are interested in
> Algerians, I mean, I don't know what he's going to say, but it occurred to
> me that might be the answer. . . .  If you want that word to come out, keep
> it up.

Trial Tr. 109-10.  The prosecutor noted at the sidebar that "[t]he agent was assigned to

the JTTF while he investigated this case, and I have not brought it out.  I have been

very careful."  *Id.* 110.

After the sidebar, defense counsel did not pursue asking Lyons about why he

was investigating Algerians.  Almost immediately, however, she elicited from Lyons

other testimony that was unquestionably inadmissible hearsay, and highly damaging

hearsay to boot:

Q:  And these individuals told you that a Marco Lubrano was actually Mr.

Khellil that had come into the United States in 1993 with a phony Italian passport, is that right, if I remember your - -

A: Could you repeat that, please?

Q: These individuals that you spoke to - -

A: Yes.

Q: - - told you that Mr. Khellil came into the United States as Marco Lubrano with a phony Italian passport; isn't that correct?

A: That's correct.

Trial Tr. 110-11. The Court notes that the apparent suggestion in counsel's question that Lyons has testified to these matters already (counsel's cut-off reference to "if I remember your . . .") was, quite simply, wrong. Lyons had given no such testimony on direct examination.

Counsel nonetheless continued to press the point, and Lyons repeated that he "was told it [Lubrano] was Mr. Khellil." *Id.* 112. The Court did not attempt to intervene at these junctures. The Court took note, however, of what appeared to be rather reckless conduct on defense counsel's part with no apparent potential upside, as well as an apparent lack of attention to or recollection of what had occurred – or, more specifically, what had not occurred – earlier in the trial.

Defense counsel next attempted to elicit from Lyons testimony on the unreliability or incompleteness of the entry and departure records he had testified about, but Lyons largely indicated that he lacked knowledge on that subject. She attempted to elicit from Lyons that it was possible that Lubrano could have left the country without anyone knowing, but Lyons gave a non-responsive answer that was damaging to the defense:

Q: Is it possible that Marco Lubrano left the United States, maybe even

> drove his taxi cab across the border to Canada, and nobody would know about it?
>
> A: I think this form [the computer record search printout], coupled with my overall investigation from source information and City of Chicago driver's license information and Secretary of State and Social Security applications and things of that nature, led me to believe that this person was here.

Trial Tr. 119-20. Defense counsel did not move to strike the answer, despite the fact that Lyons had, in substance, rendered a likely inadmissible conclusion or opinion that Khellil had not left the U.S. during the relevant period.

Defense counsel established that Lyons had not checked with the port of Baltimore to determine whether there was a ship there on December 28, 1998 – the "date of last entry" on Khellil's asylum application – that might have carried the defendant to the U.S. from Algeria. By stipulation, defense counsel offered in evidence a listing of ships that entered Baltimore Harbor between December 1 and December 28, 1998. *See* Def. Ex. 7. One of them, the Bel Abase [sic], listed that its prior port had been in Algeria.

Defense counsel also elicited from Lyons that his review of records led him to believe that Marco Lubrano had flown to the U.S. from Copenhagen. Lyons also testified that records reflected that Abderrezak Khellil – who defense counsel indicated in a question was the defendant's brother – had entered the U.S. legally on a "diversity visa" and later became a citizen, and that Khellil's mother had originally entered the U.S. on a temporary visa which she obtained in Tunis, Tunisia; overstayed that visa; and now has a green card – i.e., permanent resident status.

Defense counsel elicited from Lyons that Zam Zam's corporate records reflected

that it had been incorporated in the year 2000.  Counsel made reference to the

information Lyons had learned from Zam Zam's web site that "Chef Khellil" had fifteen

years experience.  Though counsel elicited that Lyons had looked at the web site in

2008, she asked Lyons to subtract fifteen years from 2000 (the date the company was

formed) and pointed out that in 1985, Khellil would have been thirteen years old – an

apparent attempt by counsel to suggest that the Zam Zam website must be referring to

someone other than Khellil.  Unsurprisingly, Lyons pointed out that he had subtracted

from 2008 – the year he had seen this information on Zam Zam's web site.  When

counsel inexplicably pressed this point, she elicited from Lyons that he thought this

information "was pertinent considering that [Khellil] claimed on his asylum application

that he had an ironworking company in his home country of Algeria in '97 and - - in '97-

'98 time period and then came here as a stowaway on a ship, so to me it was . . . very

important."  Trial Tr. 140.  In short, defense counsel had again elicited otherwise likely

inadmissible opinion evidence, favorable to the prosecution, suggesting Khellil had not

left the country during the relevant period.

　　　　Defense counsel also, for reasons unknown, pressed Lyons regarding the fact

that Khellil's asylum application had not mentioned Italy.  This led to the following highly

damaging and otherwise inadmissible hearsay testimony by Lyons:

> Other individuals in the investigation told me that they were told not to
> travel from that country of Italy because the authorities in that country
> would recognize the poor quality - - the poor quality of the passports being
> used, so therefore they went to a neighboring country [sic] of Denmark to
> travel to Chicago from Copenhagen so that the authorities, who would
> probably be better trained at detecting any questionable Italian passport,
> and that is why I was told that they did not travel from Italy on the Italian
> passports to Chicago, Illinois, on December 30, 1993.

Trial Tr. 142.  Defense counsel did not seek to strike this testimony.

Elias Amrouch testified as a government witness.  He stated that he came to the United States in 1992 on a visa and ultimately became a U.S. citizen.  In 1993, he lived in Justice, Illinois with Smain Djellali and others.  He believed that Khellil moved in with them in 1994.  A friend of Amrouch who moved in along with Khellil had called from Italy to say they were coming.  In 1994 or 1995, Amrouch, Khellil, and Amrouch's friend moved to the north side of Chicago, to the 4300 block of North Kedvale.  Amrouch lived there with Khellil less than a year and then moved across the street, where he lived for about one more year.  Amrouch believed Khellil worked as a cab driver.  He stated that he did not know Khellil to use any other name.  He believed that Khellil's brother and mother later moved in with Khellil.  Amrouch last saw Khellil about five or six months before trial.  Khellil never told him that he had stowed away on a boat.  Defense counsel elicited on cross examination that Amrouch has trouble remembering things. He also stated that after 1997, he saw the defendant less frequently.

Smain Djellali testified that he had come to the U.S. from Algeria on a tourist visa in 1992.  He overstayed the visa, applied for citizenship on an unspecified date, and was denied.  He is currently in the U.S. on "parole" status and has authorization to work.  In 1993, he moved to Justice, Illinois with two other men, including Amrouch.  In late 1993 or early 1994, he learned that two other Algerians were coming to live with them.  One of them, the defendant, introduced himself as Abderrahmane.  He and the other man said they had flown to the U.S. from somewhere in Europe, perhaps Scandinavia.  He recalled Khellil using another name but did not recall the name. When asked how he recalled this, Djellali testified, without objection by defense

12

counsel, that the two men had come in on a passport in someone else's name.  The

Court notes that this testimony was hearsay, absent attribution of such a statement to

Khellil – an attribution that Djellali did not provide.  *See* Trial Tr. 168.

Djellali testified that Khellil drove a taxi and that he had applied for identification

documents in the U.S.  Though the prosecutor did not elicit any foundational testimony

regarding how Djellali knew this, defense counsel did not object to the question or move

to strike the testimony.  In early 1994, Djellali testified, they moved to the north side of

Chicago, to different apartments; Khellil lived with Amrouch and others.  Djellali still saw

Khellil on occasion after that.  Djellali admitted that he lived in the U.S. illegally from

1993 through 1998.  His application for permanent residency status was denied in 1998

because he had been living in the country illegally (though he had, in the interim,

obtained a "diversity visa").  He said he had seen Khellil very little, if at all, after 1995.

Kenneth Madsen, the Chicago Asylum Office director for USCIS, also testified as

a government witness.  He stated that once a person is granted asylum, he cannot be

deported unless his asylum status is revoked.  To file an application for asylum, a

person must be physically present in the U.S.  Eligibility for asylum requires that the

applicant has suffered persecution in his home country or has a well founded fear of

persecution there on account of race, religion, nationality, membership in a particular

social group, or political opinion.

As of April 1, 1998, an applicant was required to apply for asylum within one year

of his date of entry into the U.S., with some exceptions that Madsen detailed.  The

asylum application form requires disclosure of all of the applicant's entries into the U.S.

After submitting an asylum application, the applicant is interviewed by an immigration

officer.

If an applicant moves his residence during the asylum application process, Madsen testified, he is required to file a form AR-11 advising the agency (now USCIS, formerly INS) of his new address. The form includes spaces for the person's name, file number, former address, new address, and date, place, and manner of entry into the U.S. The form has to be signed by the applicant, and it contains warnings "that there are criminal penalties for failure to register and notify the service of your change of address." Trial Tr. 200. The information on the form is used to update the agency's computer database, and the card goes into the applicant's file, "but it doesn't necessarily get matched up with it." *Id.* The agency considers the form important "because almost all of our correspondence is by regular First Class Mail to the last known address of the alien." *Id.*

Madsen testified that a person granted asylum is allowed to remain in the U.S. indefinitely and is authorized to work here. Most persons granted asylum apply for and receive permanent resident status. Form I-485 is used to apply for permanent resident status. That form, Madsen testified, requires disclosure of the applicant's date and place of last entry into the U.S. Though Madsen's office does not decide I-485 applications, he testified, without objection by the defense, that an immigration officer will compare the I-485 form with other immigration records for the applicant, including his asylum file if he has one. If there is conflicting information that bears on the person's eligibility for asylum, the file will be sent to the asylum office for review, and the

applicant's I-485 request will not be granted until the review is completed.[1]

Madsen also testified that the Form AR-11 change of address card is important to the adjustment of status process.  He testified that

> we do service by First Class Mail.  So if you were to change your address and didn't inform the [S]ervice – if we were to grant you permanent residence, the card would be sent to the incorrect address and you would have to file for a replacement card.  If there was some reason that you weren't being granted and they were going to place you into removal proceedings, they would have to serve that paperwork on you by mail, and they would have no idea where you were.

Trial Tr. 205.

On cross examination, defense counsel asked Madsen how Khellil's file had been brought to his attention and what Lyons had advised him.  There was no apparent reasonable basis for defense counsel to ask this question, which plainly called for otherwise inadmissible hearsay that could not possibly help Khellil.  Madsen responded that Lyons had given him information showing "various driver's licenses that were issued to the defendant and showing that he had been present in the United States prior to his application for asylum."  Trial Tr. 206.  Defense counsel also inexplicably asked a question that re-introduced damaging information about her client that was otherwise inadmissible hearsay:

> Q:  Well, what if I told you that Mr. Lyons began this investigation because two supposed individuals came forward and said that this defendant had assumed the identity of an Italian who had entered the United States

---

[1]  The Court notes that Khellil's I-485 form *did* contain information that conflicted with his asylum application – an approximate four-week discrepancy in the "date of last entry" (December 28, 1998 on the asylum application; December 2, 1998 on the application to adjust status).  Contrary to Madsen's testimony, there was no evidence or indication that this led to review of Khellil's asylum status or impacted the granting of his application to adjust status.

illegally under a false passport?

A:  It is possible.

Trial Tr. 207.  Again, there was no upside for defense counsel in asking this question.

Defense counsel then went on to elicit from Madsen that as a result of review of Khellil's file, USCIS issued a notice of intent to revoke his asylum status.  This was evidence the government had not offered and likely could not have introduced.  Trial Tr. 207-08.  *See also id.* 208-09 (defense counsel eliciting, via an extended question, inadmissible hearsay testimony that Lyons had "some indication that [defendant] might have assumed a different identity before").  Defense counsel also later elicited from Madsen testimony that, based on a defense motion *in limine*, the Court had precluded the government from introducing:  Madsen's lay comparison between the photo on the "Lubrano" driver's licenses and a photo of Khellil.  *See* Trial Tr. 223 (Q:  "[W]hen Mr. Lyons presented to you those Illinois Department of Motor Vehicle documents, did you go back into your computer system to determine whether to nor there was any relationship between the name on those documents and the applicant's name in this application?  A:  In actuality, if I'm not mistaken, he had a copy of the driver's license *with the applicant's picture that matched the file*." (emphasis added)).

Madsen testified on cross examination, as he had on direct, that illegal or improper entry into the United States is not held against an applicant for asylum. Counsel went through Khellil's asylum application with Madsen.  Madsen testified that Khellil had stated in the application that he last left his own country on December 2, 1998 and that he last entered the U.S. on December 28, 1998 in Maryland.  His status at entry was "without inspection."  The immigration officer who interviewed Khellil had

16

written in, presumably based on the interview, that Khellil said he had entered at Baltimore and had been "smuggled on board a ship without a passport or visa." Khellil's application identified his citizenship as Algerian and his ethnic group as Berber. Counsel also reviewed with Madsen what Khellil had stated in his application about persecution while in Algeria.

Defense counsel elicited from Madsen that when an alien comes into the U.S., he fills out an I-94 card, and the bottom part of the card is given to the alien. If and when he leaves the country, the alien is "supposed to" turn the card in at departure. Madsen stated that it has only been since 2006 that USCIS has been able to verify applicants "against the entry-exit system." Trial Tr. 233. Madsen professed some lack of knowledge but agreed with counsel's statement that before the September 11, 2001 terrorist attacks, "there wasn't really a system to register anybody's departure" from the U.S. Trial Tr. 234. Madsen further testified as follows:

Q: . . . So if this individual, as Mr. Lyons presented the information to you about him having come into the United States in some false way before, there was no way to know whether that person who may have entered and been documented in a computer system ever left?

A: That's correct.

Q: So it would be an assumption on the part of anyone to think that whomever entered in 1993 stayed continuously in the United States until 1998 and after; it would be an assumption, would it not?

A: It depends on the evidence that you present.

Q: Well, but you couldn't rely on the INS records because, as you testified, there really isn't a way to document a person leaving the United States, at least not then?

A: Well, I'm just saying. So, for instance, someone had applied for asylum and they were eligible for work authorization and they renewed

17

that work authorization year after year, you would have evidence that they
were in the United States year after year.  If someone applied for some
other documentation year after year, it would show that they were here.

Trial Tr. 234-35 (emphasis added).  The first of these three questions elicited

information helpful to Khellil's defense; the other two were superfluous and allowed

Madsen to give an opinion, unhelpful to the defense, regarding how one could

determine whether a person in Khellil's shoes had or had not left the U.S. during the

relevant period.  On further questioning, however, Madsen agreed that there was no

way to tell for sure whether a person had left the United States, and that "it would be an

assumption on the part of the immigration service to think that just because a person

entered in 1993 as a visitor, that they never left."  *Id.* 235.  He stated that other

information would have to be consulted, beyond just immigration and entry/exit records.

He testified that millions of people enter the U.S. every year and that at least in the

1990's, few of them documented their departures.  Trial Tr. 237.

Defense counsel also asked Madsen questions regarding the one-year rule for

asylum applications.  Madsen stated that if a person is lawfully in the United States, he

is considered to have a legitimate reason for not filing for asylum within one year of his

last entry.  "So we would give you a pass on the one-year rule because you're in [lawful]

status."  Trial Tr. 240.  Madsen also agreed that the one-year requirement did not take

effect until 1997 and that the INS "gave everyone a year to comply."  Trial Tr. 241.

Madsen also stated that if a person had entered the U.S. in 1993 and had left and

returned between then and 1998, the one year would run "from the date of re-entry," in

other words, from the date of his "[l]ast entry."  Trial Tr. 243.

Defense counsel also introduced via Madsen the possibility that someone else,

18

using Khellil's photo, conceivably might have applied for the driver's licenses identified in other witnesses' testimony.

On redirect of Madsen, the prosecution reemphasized the importance of the change of address card (Form AR-11) in the asylum application process – if an applicant for asylum moves, then jurisdiction for determining the application would change to a different immigration office.[2]  Trial Tr. 257-58.  The prosecutor also elicited that Khellil's asylum application did not disclose his use of other names in a blank provided for that information and that Khellil stated in the application that he had not entered the U.S. prior to December 28, 1998.

Grant Vreuls of the Social Security Administration (SSA) testified regarding SSA records.  An application for a Social Security card in the name of Marco Lubrano was filed on February 10, 1994.  The application reflected that an Italian passport was submitted as identification, along with a tourist visa and a driver's license.  SSA earnings records showed that Lubrano had self-employment earnings in 1997 and 1998 but no earnings for 1999-2006.  An application for a Social Security card in the name of Khellil was filed on May 24, 2000, in Chicago.  SSA records showed that Khellil had self-employment earnings for 2000-06.

At the outset of her cross examination of Vreuls, defense counsel asked, in an open-ended fashion, whether anything suggested that the two Social Security card applications had been prepared by the same person.  Before Vreuls could answer, the Court called a sidebar and stated to defense counsel:

---

[2] Khellil had obtained asylum, however, years before he filed the Form AR-11.

THE COURT:  I recognize that there was no objection to that question, but I do feel that at some level I have some duty to intervene on various things, okay.

I just want to make clear that you understand what you are doing here. You are asking a government witness to do something that, if you were to ask me to exclude it, I would exclude.  You are asking a person who doesn't have any expertise beyond the jury's expertise essentially to make a handwriting comparison.  It's not a proper question.  It's just not a proper question.

DEFENSE COUNSEL:  Okay, I will rephrase the question.

THE COURT:  Quite frankly, I think it is - - to call it foolhardy would be a gross understatement.  It is reckless.

DEFENSE COUNSEL:  Okay.

THE COURT:  It's absolutely reckless.  You know, it violates every rule of cross examination that is known to human beings, and it's even worse than that because you are asking it of an adverse witness, for crying out loud.  . . .

Trial Tr. 288-89.  The Court pointed out at the sidebar that a comparison of the exhibits arguably appeared to reflect some similarities in handwriting.  *Compare* Govt. Ex. Social Security 1 *with* Govt. Ex. Social Security 2.  The Court stated to defense counsel:  "So if you want to ask a question that is very likely to elicit an answer that is going to be extraordinarily harmful to your client, go ahead, and then I will deal with the 2255 motion when it comes in[,] in a year or six months or whenever it does."  Trial Tr. 289-90.  Counsel did not pursue the question further following the sidebar.

Craig Turton of the Illinois Secretary of State's office also testified.  During Turton's testimony, the government introduced driving records and applications for driver's licenses in the names of Marco Lubrano and Abderrahmane Khellil.  A 1999 application for Lubrano reflected that he had used a taxicab license, a firearms card,

and a credit card as proof of his identity. Among other things, the records reflected that after the Lubrano driver's license was suspended in December 2000, there was no attempt to reinstate it. The Khellil records showed that he was first issued a driver's license in June 2000.

Chavonne Carter, another Illinois Secretary of State employee, testified regarding vehicle registration records bearing the names Marco Lubrano and Abderrahmane Khellil. They reflected that over a period of several years, Marco Lubrano had registered several vehicles, listing an address of 4327 North Kedvale, Apartment 207, Chicago on some and a Hickory Hills address on others, and that he was identified as the seller of certain of those vehicles on the purchasers' title applications. Carter also identified an application for title showing a sale of one of the vehicles from Marco Lubrano (with a Hickory Hills address) to Abderrahmane Khellil (with an Oak Lawn address) in 2000. Certain of the Khellil records showed an address of 4207 North Kedvale, Apartment 2D. The records included driver's license photos of Marco Lubrano and Khellil that a reasonable juror could find depicted the same person, namely, the defendant.

Marisol Acevedo identified herself as an employee of the City of Chicago's department of business affairs and consumer protection. She introduced into evidence records relating to chauffeur's license applications by Marco Lubrano for each year from 1995 through 2000. The records included photos of the applicant, and the 1995 application included fingerprints of Marco Lubrano.

Kenneth Woods, a fingerprint specialist in the Immigration and Customs Enforcement forensic laboratory, also testified as a government witness. He had

21

compared Khellil's fingerprints with two sets identified as those of Marco Lubrano. He opined that the fingerprints all came from the same person.

During her cross-examination of Woods, defense counsel handed him a completely different fingerprint card, saying "I'm sorry to spring this on you." Trial Tr. 444. She initially asked Woods to compare the prints on the card with the others he had reviewed: "Would these prints or the prints that you have identified, would they be similar to any one of those that you have on the screen?" *Id.* Woods said that "I would have to compare them . . . . I'm not going to make a definitive court determination without putting a loop on them and comparing them." *Id.* In response to further questioning, Woods said that "based on the cover sheet," it appeared that the prints had been sent to the FBI. Counsel then asked Woods – who works for ICE, not the FBI – whether there was "anything that came back from the FBI for identification purposes." Trial Tr. 445. The government objected, and the Court sustained the objection on foundational grounds. *Id.* Counsel nonetheless pressed ahead; the government requested a sidebar; and the Court excused the jury.

After the jury was excused, the prosecutor stated:

> PROSECUTOR: . . . This witness, she is basically having him testify about things he has never seen and doesn't know. And it's a print card that is not in evidence, and I believe it's potentially reckless. We could potentially have him make a comparison and come back in my rebuttal case, or perhaps I will ask for a short continuance of an hour or two so I can have him compare it. And we - - I didn't even get enough time - -

Trial Tr. 446. The Court, somewhat stunned by defense counsel's attempt to have a prosecution expert witness perform an impromptu fingerprint comparison in the courtroom, stated as follows:

22

THE COURT:  You know, we had a situation earlier in this case, and I guess I'm so honestly blown away by what has been happening for the last 15 minutes here that I'm not going to be able to come up with the details of it.  But there was an earlier situation in the case where defense counsel attempted to have a witness do a comparison on the witness stand, and I asked for a sidebar, and I think the word "reckless" was the word that I used, and I don't recall the specifics.  It was two days ago.

I'm just completely nonplussed by what you are doing here . . . .  You are asking a government fingerprint expert, sight unseen, you're sticking some fingerprints in front of him that on their face are your client's, and you are asking him to compare them.  Now, I mean, maybe you're just crazy like a fox here, but, honestly, I don't know of any competent - - and I'm using these words carefully.  I don't know of any competent lawyer, you know, since the O.J. Simpson trial when the prosecutor attempted to have an experiment done on the witness stand and it blew up in his face - - I don't know of any competent lawyer who's ever done anything like that.

And that, combined with a bunch of other things that have happened in this trial, leave [sic] me to seriously question whether Mr. Khellil's Sixth Amendment rights are being satisfied in this case.  I'm just - - I'm stunned.

I spent most of my life trying criminal cases.  I saw a lot of good lawyers; I saw a lot of bad lawyers;  I have never, ever seen the stuff that I have seen happening in this courtroom during this trial.  I have just never seen it.  Reckless doesn't come close to capturing it.  It's beyond reckless.  It's just beyond reckless.

Trial Tr. 446-48.

After further discussion about prior events during the trial, the discussion turned back to the propriety of defense counsel's questions regarding the FBI fingerprint card. Defense counsel advised that she obtained fingerprints from Khellil and sent them to the FBI "as to who it is and if there is a previous identity and criminal history," and that the FBI replied, "no record."  Trial Tr. 451.  The Court, returning to the prosecution's objection, asked defense counsel how she planned to authenticate the fingerprint card she had shown to Woods:

THE COURT:  Now, you have some witness later on in the case that

23

you're going to introduce this through?

DEFENSE COUNSEL:  No, I'm asking him if - -

THE COURT:  Well, that is the problem, and . . . that was the basis for [the prosecutor's] objection.  It was one of the basis for [the] objection is that you're handing him a document that is not in evidence.  It hasn't been authenticated.  You just told me you are not intending to introduce it.

. . .

You tell me how it is that appropriately under the Rules of Evidence  you can have somebody do a comparison with a document that you have no intention of authenticating or getting in evidence.  How is that appropriate?

DEFENSE COUNSEL:  I'm only using if for identification purposes at this juncture, simply because it is - - it comes from the FBI.

THE COURT:  Ma'am, focus on my question.

. . .

THE COURT:  You asked him if he could make a comparison, okay.  Now, you asked him if he could make a comparison.  He said, not right at the moment; I would have to analyze it.  Now, basically, if I was the government, as [the prosecutor] suggested a second ago, and I'm not putting words in her mouth, what I'd say right now is, gee, Judge, I'd maybe like some time to go have a comparison done of this thing so I can find out.

So you have opened that door, okay.  And you have opened that door with an exhibit that you have no intention of authenticating.  You stuck this thing in front of a witness.  You don't have a witness who is available to authenticate it.  You're not planning to call your certified fingerprint examiner.  He's not on your list.

. . .

You're not planning to call this guy to have him testify, to have him say - -

. . .

- - that I met with Mr. Khellil on such [and] such a date and I rolled his prints and here they are?  You have no intention of doing that?

DEFENSE COUNSEL:  Well, how that I mention it - - now that you mention it, I could have him come in and testify.  But look, let me - - the point of my asking this was that - - probably you are correct that I asked the wrong question if he could identify, but I was really only trying to restore his credentials to the eyes of the jury.

THE COURT:  You are trying to restore the other side's expert's credentials?

DEFENSE COUNSEL:  No, no, just let me explain.  Can I finish?

THE COURT:  Ma'am, I'm just quoting your words back to you.  You're trying to restore his credentials.

DEFENSE COUNSEL:  I'm not going to say anything anymore.  I have been grossly insulted in terms of my competency.  You are leaving me open to all kinds of accusations.  I just won't say anything anymore.

THE COURT:  You know what, I have a responsibility when I see a defendant's Sixth Amendment rights at risk to protect those rights or to do something --

DEFENSE COUNSEL:  I'm not violating his Sixth Amendment rights.

THE COURT:  I have reason to believe that Mr. Khellil is not receiving the effective assistance of counsel at this moment in time.

Trial Tr. 451-55.

After further discussion, the topic returned to the propriety of defense counsel's questions to the ICE fingerprint examiner regarding the FBI's analysis of Khellil's fingerprints:

THE COURT:  . . .  I'm dealing with an objection that's been made where you have put in front of the jury and you have put in front of the witness an unauthenticated exhibit that you have -- that you told me a moment ago that you have no intention of putting in evidence, and you have asked the other side's witness to make a comparison.  That is not appropriate under any standard of evidence, putting completely aside the Sixth Amendment issue.

DEFENSE COUNSEL:  Well, then I will withdraw the exhibit if it's going to cause this much consternation.  And my line of cross examination will be different.

25

Trial Tr. 455-56.  The Court ultimately sustained the government's objection to defense

counsel's line of questioning:

> THE COURT:  My ruling that I'm going to make is that I'm going to sustain
> the objection to the questions that asked Mr. Woods to compare the
> fingerprints on the Defense Exhibit 25 to other fingerprints.  And the
> reason for that, as I described before but as I will summarize now, is that
> Defense Exhibit 25 is not in evidence.  I have been told it's not going to be
> offered into evidence, and so, therefore, it is not appropriate to ask those
> questions.

Trial Tr. 459.  The Court advised defense counsel that if she intended to call in the

defense case a witness who could authenticate the fingerprints, the Court would require

the government to keep its fingerprint examiner available to testify once that predicate

was laid.  *Id.* at 460-62.

John Tiedt, who works for the Department of Homeland Security (DHS)

employee as an adjudications officer, also testified for the government.  He testified

regarding Khellil's I-485 application for permanent resident status.  He stated that DHS

received the application on June 4, 2003.

After the government rested its case, defense counsel advised the Court of her

intention to call Bonnie Schwid, a forensic document examiner, as a defense witness.

The prosecutor objected, saying that the only pretrial disclosure the defense had

provided regarding Schwid concerned her examination of Khelli's Social Security

application, not any other documents.  Defense counsel replied that she planned to call

Schwid to testify about other documents that had been the subject of the government's

pretrial expert disclosure.  The prosecutor noted that the government had not called its

expert to testify, and she objected to testimony by Schwid beyond the scope of the

defense pretrial disclosure.  The Court sustained the government's objection and

limited Schwid's testimony during the defense case in chief to the matters covered by defendant's pretrial expert disclosures. The Court stated, however, that the defense could call Schwid to testify on the previously undisclosed points in the event that the government called its expert in rebuttal, so long as defense counsel provided a prompt and detailed verbal disclosure of Schwid's remaining opinions. This ruling in effect partially relieved defense counsel from her noncompliance with the disclosure requirements of Federal Rule of Criminal Procedure 16(b)(1)(C).

After this extended colloquy, defense counsel questioned Schwid about her work. Schwid appeared to testify that she had examined both the Khellil and Lubrano Social Security card applications. She stated that she had taken handwriting samples from Khellil.[3] Specifically, she stated that she had whited out information on the Lubrano application and had Khellil fill in certain parts, including the signature, as if he were Lubrano. She opined that the signature on the Lubrano application ad not been written by Khellil. At this point the government objected, and there was a discussion at sidebar. The government contended at the sidebar that Schwid had not provided the Lubrano application with her report but rather had provided only the Khellil application. After a lengthy discussion in which the Court attempted to sort out, with some difficulty, what defense counsel had produced and when, and ascertained that defense counsel likely had not produced all of the attachments to Schwid's report, the Court decided to nonetheless permit Schwid to testify about both the Khellil and Lubrano Social Security card applications and then interrupt her testimony to give the government overnight to

_____

[3] The adequacy of the disclosure of the exemplars was a subject of a dispute that the Court essentially adjudicated in Khellil's favor.

prepare to cross examine her.

Back on the witness stand, Schwid stated that she had obtained additional handwriting samples from Khellil, including several attempts to write or sign Lubrano's name. Having reviewed these as well as Khellil's own Social Security card application, Schwid opined that Khellil was not the person who had written the "actual" Lubrano signatures she had reviewed.

Robert Ahlgren, a Chicago attorney concentrating in immigration law, also testified as a defense witness. He testified at some length about forms that foreign visitors fill out when coming to the U.S. and records that are kept of entries into this country. Ahlgren further testified that historically (through 2001), the immigration authorities had not been given funding to implement a system to track when foreign visitors leave the country. For that reason, Ahlgren stated, even if there is no record of an alien's departure, "I would never take this as to say that this person never left and is still here and we can go find him. That would be kind of silly." Trial Tr. 576. The date of departure might be logged if the person turned in his I-94 card on departure and the immigration authorities recorded that information. Ahlgren testified, however, that this was "virtually an impossible task. Congress never gave them the money to do it, so how could they do it? But it was done a lot. There's no doubt about it." Trial Tr. 578.

Ahlgren further testified that a report of the INS's inspector general prepared at the request of the head of INS concluded that the agency's recordkeeping regarding whether aliens who had come into the country had left was "woefully inadequate" and "not up to minimum standards." Trial Tr. 594. He further testified as follows:

Q: In fact, the immigration service could not track the departures of

anybody coming in or leaving the United States after they had been admitted so that they had a tendency to overexaggerate the population of illegal aliens; isn't that correct?

A:  Well, the [S]ervice was pretty good, I think, at knowing who came in, but the question was knowing who left.  And obviously we're excluding people who came in - - we're not talking about people who came in illegally.  We're only talking about people who came in as nonimmigrants through the regular admission process, right.

Trial Tr. 594.  Ahlgren also stated that there were a number of ways that a person could leave the U.S. that would not have come to the attention of the immigration authorities at the relevant time.  He also stated that during the period in question, aliens were not required to turn over their I-94 cards upon departure from the U.S.

On cross examination, Ahlgren repeated his conclusion "that the I-94 system of departure does not accurately report everybody who leaves."  Trial Tr. 597.  He agreed, however, that an individual himself might have records that would show his comings and goings into the U.S.[4]  Ahlgren also stated:

Q:  And would it be fair to say that if an individual came to your office and they had an issue of physical presence, establishing physical presence in the United States for a form of relief, would you look for things like lease records or income tax reports or records from the government?

A:  Sure, exactly, yes.

Q:  Records from the city of Chicago?

A:  Yes.

Q:  Records from the Secretary of State?

A:  Yes.

---

[4] Defense counsel did not object to this arguable reference to Khellil's failure to testify.

29

Q:  Records from the Social Security Administration?

A:  Yes.

Trial Tr. 599.

During the instruction conference near the end of trial, defense counsel appeared to articulate, for the first time, an objection to the introduction of all the "Marco Lubrano" evidence – in other words the evidence suggesting that Khellil had passed himself off as Lubrano – as irrelevant and unfairly prejudicial.  Trial Tr. 624.  The Court pointed out that the defendant had made no prior objection to this evidence, and it overruled the objection.  Trial Tr. 625.

At the outset of the final day of trial, defense counsel advised the Court of her intention to call the government's forensic document examiner as a defense witness. Counsel made it clear that she was doing this so that she could then ask defense expert Schwid to rebut the government expert's opinion.  The prosecutor objected to this.  She argued that it the defense could not get in testimony that the Court had previously excluded by artificially setting it up as rebuttal in this way.  The Court sustained the government's objection.  It concluded that the defense "cannot open [its] own door" to put in during the defense case in chief evidence that the Court had previously excluded due to defense counsel's noncompliance with Rule 16.  Trial Tr. 634.

Defense counsel nonetheless decided to call the government's forensic document expert, to get in testimony regarding "the inconclusiveness of [her] opinion" about whether Khellil's handwriting appeared on the Lubrano documents.  Trial Tr. 634. (The Court again notes that the government had not attempted to put in evidence on

30

the underlying point.)  That witness, Joan DiMartino, testified that she works for the ICE laboratory.  Defense counsel established at length DiMartino's qualifications and experience as a forensic document examiner.  DiMartino testified that she had examined numerous "questioned documents" – including the Marco Lubrano Social Security, City of Chicago, and Illinois Secretary of State records, as well as the Khellil Social Security application  – and compared them with handwriting exemplars of Khellil obtained by the agent Lyons.  These exemplars included Khellil writing his own name and the name Marco Lubrano.  Defense counsel elicited in detail the process that DiMartino had used to make her comparisons.

DiMartino testified that she had there were similarities in the Lubrano documents that indicated they may have been prepared by the same person.  Trial Tr. 657.  She concluded, however, that none of the documents could be used to make an "elimination"; most of them were essentially unsuitable even for comparison because they were photocopies; and a few could be used for "superficial" comparison at most.

Defense counsel also asked DiMartino about the Khellil documents she had examined.  DiMartino stated that the comparison documents were largely photocopies. She went on to state that there was "more of a natural flow" in earlier examples of Khellil's writing than in the handwriting exemplars that Lyons had obtained from Khellil. Trial Tr. 664.  Defense counsel continued to press forward – in what appeared to the Court (based upon its observation at the time) to be a completely unplanned fashion. When DiMartino indicated that certain of the signatures "didn't appear to be that skilled in appearance," Trial Tr. 668, defense counsel asked her, in an open-ended way, the following:

31

Q: . . . maybe I should ask what do you mean by skill?

A: Looking at that Social Security signature, it has the appearance of being written slowly. It has disconnected strokes to them [sic]. There's nothing complex about the appearance of that writing. . . .

Trial Tr. 669. Defense counsel, who apparently was oblivious to what was about to

happen, pressed on:

Q: So you're telling us that Marco Lubrano has poor penmanship?

A: I didn't say that.

. . .

A: Whoever wrote that I'm not going to grade on penmanship, but I'm saying it appears to be very simplistic writing, not complex writing.

Q: Did that characteristic appear over and over again on some of the copies of Marco Lubrano's signature that you reviewed? Was that fairly consistent that he had a poor skill level?

A: The questioned signatures that I could observe were not consistent.

Q: Ah. What was the difference, then?

A: There was some - - what I could observe in the photocopies, even the clear photocopies, there were some dissimilarities. There were some unexplained variation [sic] in the photocopies. I cannot determine definitively what occurred because they're photocopies.

Trial Tr. 669-70.

After eliciting that there is some normal variation in a person's signature, counsel

asked DiMartino to state her conclusions, from her previously-produced written report

as a potential government expert witness:

Q: So the bottom line is that you state in your findings that no determination could be reached due to the following factors, correct? I'll read your report out loud but I'd rather you testified to it.

A: I certainly can read that. "A comparative examination was conducted

32

of the questioned writing and the known writing of Khellil, Abderrahmane. No determination could be reached due to the following factors:  *The exemplars prepared on 1/13/09 by Mr. Khellil revealed evidence of unnaturalness and elements of disguise.  There were characteristics of distortion in specific areas of his writing* in the portions that are comparable to the questioned material, Marco Lubrano signatures . . . . Much of this writing was devoid of the clarity necessary for a proper examination.  The noncontemporaneous writing with the length of time between the execution of the questioned and known writings is yet another hindrance in the examination process. . . .

Trial Tr. 672-73 (emphasis added).  In other words, defense counsel elicited – knowingly, as this was in DiMartino's previously-produced report – expert testimony that her client had attempted to disguise or distort his writing when preparing the handwriting exemplars !

On cross examination, the prosecutor, unsurprisingly, reemphasized this aspect of DiMartino's conclusions.  She asked DiMartino to describe, in detail, the factors that led her to the conclusion that Khellil had tried to distort his writing when preparing the handwriting exemplars.  Defense counsel tried to repair the damage on redirect examination, but in the Court's view, it was too little, too late.  The Court again emphasizes that the government had not called DiMartino and that this damaging testimony was introduced only because defense counsel decided to call DiMartino in her case and asked DiMartino to recite the entirety of her conclusions, including the opinion that Khellil had tried to disguise his handwriting in the exemplars.

After the conclusion of DiMartino's testimony, the government conducted its cross examination of defense expert Schwid.  The prosecutor elicited than when Schwid instructed Khellil, while preparing handwriting exemplars, to write Marco Lubrano as a signature, he wrote "M Lubrano," not the full name Marco Lubrano.  The

prosecutor also attempted to establish other factors that would detract from the weight to be given to Schwid's conclusions.

After briefly recalling agent Lyons to the stand, the defense rested.

In closing argument, the prosecution argued that Khellil had come to the U.S. posing as Lubrano and lived that way for years. But when he decided to try to get permission to remain in the U.S. permanently, he had to "ditch the story" and his life as Lubrano to make things work. At that point, the government argued, Khellil invented a whole new story – "that he stowed away on a ship that happens to come ashore in Baltimore, Maryland, in 1998," Trial Tr. 751, and was fleeing persecution in Algeria. But, the prosecutor argued, "the reality . . . was that he'd been living in the United States for the past four years." Khellil could not disclose that, the prosecution argued, because of the one-year limitation on applying for asylum: "how can he prove that he came to the United States in 1998 and filed for asylum by 1999 if he's actually been living here in the United States since 1993?" To avoid the problem, the prosecution argued, Khellil had filed his asylum application "in another city [San Francisco], this time with his real name, and he makes up a story about coming on a ship as a stowaway. He puts on that application that he used no other names and that he never left the country." Trial Tr. 752.

Khellil's success in obtaining asylum, the prosecution argued, meant that he was stuck with his statements in that application. So when he applied for permanent resident status, the prosecution argued, he continued the story about coming in as a stowaway in Baltimore on the date he had asserted in his asylum application. "We know this is not the true date of his entry," the prosecutor argued, based on the

testimony of Amrouch and Djellali that Khellil lived here "during the time that he was supposedly living in Algeria." Trial Tr. 756. The prosecution also emphasized the evidence about the Lubrano documents, arguing that Khellil had renewed his taxi license in 1997, 1998, 1999, and in 2000 as Lubrano.

The prosecution also argued that "the statements [Khellil] made in his applications to immigration were clearly material. Had Mr. Khellil told the truth on his applications, they would have been denied, and he would not have been in the position to apply for the green card. If he had told the truth on his change of address form, the lie [sic] on the form would have had a major impact on the decision maker," attributing this to government witness Madsen. Trial Tr. 760. The prosecution also argued that failure to advise the immigration authorities of a change of address would have violated the immigration laws, "and it could subject one to fine, imprisonment and/or removal." *Id.* It argued that Khellil did not want that to happen and "did not want to have any changes made on those forms, truthful or not, that would tip off an immigration officer that he had been living in the United States for several years under an assumed identity." Trial Tr. 760-61.

Defense counsel argued that to convict Khellil, the jury "ha[d] to be convinced that Marco Lubrano came in in 1994 and never left, because if he left the country and then came back on some boat, he was still eligible for asylum if he filed in a year. But this isn't an immigration case. You're not here to decide whether he was eligible for asylum or not. That's beside the point. . . . What you're here to do is to find out whether he lied on two pieces of paper, whether he lied and knew that whatever he was saying was untrue." Trial Tr. 765. The Court notes that this purported restatement of

the issues for the jury omitted the element of materiality, an issue that defense counsel did not even address during her closing argument.

Defense counsel focused her presentation to a significant extent on regarding whether Lubrano and Khellil were the same person. Counsel also discussed the evidence that a ship from Algeria was moored in Baltimore on the date that Khellil said he had entered the U.S. there as a stowaway. In addition, she took issue with Lyons' testimony suggesting that "Lubrano" had never left the United States. She argued that the immigration records regarding departures from the U.S. were unreliable and that the jury could infer nothing from the absence of evidence that Lubrano had left the country.

The jury found Khellil guilty on both charges. In anticipation of the possibility of a guilty verdict, the Court had directed the courtroom deputy clerk to have the Federal Defender Panel "duty" attorney for the day to be present in court when the verdict was returned. After excusing the jury, setting a sentencing date, and advising Khellil about the presentence investigation process, the Court said the following:

> THE COURT: There is one other issue that I do want to take up. I asked the federal defender duty attorney to be brought up here -- to come up here, and that's Ms. Francoeur, who is sitting over at the side of the courtroom. I'm going to tell you why I did that. I expressed some concerns yesterday and perhaps the day before yesterday on the record regarding defense counsel's performance. I expressed -- I didn't express any today, but some further events happened this morning that gave me further concern, and I think that it's important to make sure that Mr. Khellil at least has the opportunity to consult with other counsel in preparing posttrial motions, the date for which I'm going to set in a second.
>
> I have no idea whether Mr. Khellil qualifies for the federal defender or not, and certainly you'd be free to, you know, retain your own counsel if you want to, but I'm going to make the federal defender available to you. That's the young lady sitting over at the side of the courtroom there. And I'm going to set the case for a status in about ten days just so I can check back on that.

Trial Tr. 798-99.

**Discussion**

**1.      Khellil's post-trial motions**

      **a.      Trial counsel's motion**

Several days after the trial, Khellil's trial counsel filed a motion for judgment of acquittal.  She did not move for a new trial.  As grounds for a judgment of acquittal, trial counsel argued:

- As to Count 1, trial counsel argued that there was insufficient evidence of materiality regarding the alleged false statements on the I-485 form.  Counsel did not make a materiality argument regarding Count 2.

- Trial counsel argued that the government failed to prove that December 1998 was not Khellil's date of last entry into the U.S.  In the course of this argument, trial counsel also challenged the admission of records from the INS, the Illinois Secretary of State, and the City of Chicago, and an Illinois Firearm Owner's Identification card application under Lubrano's name.

-  Trial counsel also argued that the Court had erred in refusing to permit defense expert Schwid to testify that certain conclusions of the government's handwriting analyst were incorrect.

- Trial counsel argued that the Court had improperly "barred prosecution witnesses from answering certain questions posed by defense counsel in cross-examination."  Def.'s Mem. at 11.

- Finally, trial counsel argued that the Court exhibited bias against Khellil; had concluded that Khellil or his conduct was "related to some aspect of terrorism," *see id.*

37

at 11-12; somehow knew "more information about the case than what was disclosed to the defense in pre-trial discovery," *id.* at 12; exhibited a bias against trial counsel, "intended to disrupt the attorney / client relationship," and tried to secure "the services of a more compliant federal defender."  *Id.* at 13.

### b. Successor counsel's motion

Successor counsel moved for a judgment of acquittal or for a new trial, making the following arguments:

-        The government failed to prove that Khellil's statements on the I-485 and AR-11 forms were false because it had not shown that the dates and places disclosed on those forms were not the dates and places of his last entry into the U.S.

-        The government failed to prove that the alleged false statements were material to the relief sought on the two forms.

-        Khellil is entitled to a new trial because trial counsel rendered ineffective assistance.

## 2.      Defense expert Schwid

The Court deals first with trial counsel's argument that the Court improperly barred defense handwriting expert Schwid from testifying that the government's handwriting expert was incorrect in his conclusion that comparison "between 29 documents and 150 handwriting exemplars" was impossible.

A key flaw in this argument is that the government did not call its expert to testify and did not introduce any evidence about the expert's conclusion.  In short, the conclusion that trial counsel wanted Schwid to rebut were never introduced in evidence. There was nothing to rebut.

In any event, trial counsel's argument disregards how the issues surrounding the scope of Schwid's testimony actually unfolded at trial. When trial counsel advised that she intended to call Schwid to testify, the prosecutor objected to testimony beyond the scope of the pretrial expert disclosure regarding Schwid. Rule 16(b)(1)(C) requires disclosure of "a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial," including "the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). Trial counsel conceded that her pretrial disclosure regarding Schwid referenced only her examination of the Social Security card applications. For this reason, the Court properly barred trial counsel from eliciting testimony from Schwid during the defense case in chief that concerned topics beyond the scope of the pretrial disclosure. *See* Fed. R. Crim. P. 16(d)(2)(C) (if a party fails to comply with Rule 16's disclosure requirements, the court may "prohibit that party from introducing the undisclosed evidence"); *United States v. Hoffman*, 530 F.3d 137, 187 (3d Cir. 2008) (exclusion is an appropriate sanction for defense violation of Rule 16(b)(1)(C)); *United States v. Day*, 524 F.3d 1361, 1371-72 (D.C. Cir. 2008) (same).

The Court partially relieved the defense from trial counsel's failure to make disclosure of Schwid's opinions that went beyond the scope of her pretrial disclosure. The Court advised trial counsel that if the government called its handwriting expert in rebuttal, the defense could recall Schwid to rebut his opinions, so long as trial counsel made a verbal disclosure of Schwid's additional opinions. But trial counsel attempted to preempt the Court's ruling by calling the government's expert herself, during the defense case in chief. The government objected, and the Court sustained the

objection. This ruling was appropriate. Trial counsel wanted to call the government's expert for the purpose of setting up testimony for Schwid to rebut. "It's clear that a party may not call a witness for the sole purpose of impeaching him." *United States v. Giles*, 246 F.3d 966, 974 (7th Cir. 2001). And even were that not the case, the Court appropriately precluded trial counsel from doing an end-run around the Court's preclusion ruling under Rule 16. There was no error in the Court's ruling.

### 3.    The claim of judicial bias and barring questions on cross

Trial counsel's claims that the Court was biased against her and Khellil, that the Court had extra-judicial information about the case, and that the Court intended to disrupt the attorney-client relationship are incorrect and are largely based on mischaracterization or misunderstanding of the record. Because these contentions are interrelated with trial counsel's claim that the Court *sua sponte* barred prosecution witnesses from answering certain questions on cross examination, the Court will deal with all of these points together.

On three occasions during the course of the trial (a trial that covered over 750 pages of transcript), the Court commented on or pointedly inquired about trial counsel's conduct. All three instances took place outside the jury's presence. In short, the Court took care to ensure that the jury would not be affected by the Court's comments to defense counsel or about her performance. In any event, the Court did not comment on the merits of the case; its remarks were directed at counsel's performance. As such, the comments would not serve as a basis to overturn Khellil's conviction even if the Court had made them in the jury's presence – which it did not do. *See, e.g., United States v. DiTommaso*, 817 F.2d 201, 220 (2d Cir. 1987); *United States v. de la Cruz*,

40

249 Fed. Appx. 833, 836 (1st Cir. 2007).

The first two episodes involved sidebars that the Court called for *sua sponte*. The defendant was present at neither of these, so there is no basis for a contention that the Court used these occasions in some sort of an attempt to interfere with trial counsel's relationship with Khellil. The Court also notes that it intervened only twice, not every time trial counsel appeared to make a significant misstep. On both of these occasions, the Court intervened because trial counsel seemed oblivious that her actions were likely to lead, imminently, to the admission of evidence that would be highly prejudicial to her client. The Court's actions in this regard hardly reflected a bias against Khellil; rather, the Court was attempting to protect his right to a fair trial.

The third episode was the only time during the course of the trial that the Court commented on counsel's performance in Khellil's presence. This, too, involved an incident in which defense counsel's performance was seriously deficient. The Court again acted to protect Khellil's right to a fair trial.

The Court discusses in turn each of these events, as well as its comments after the jury returned its verdict.

*The first court-ordered sidebar.* The first episode took place during the testimony of ICE case agent Lyons. This episode also forms the basis for trial counsel's rather bizarre suggestion that the Court had extra-judicial information about Khellil or the investigation. By way of background, as discussed earlier in this decision, during Lyons' direct examination, defense counsel objected to the admission of immigration records on chain-of-custody grounds. The Court dealt with the objection at sidebar. In response to a question by the Court regarding the chain of custody, the prosecutor

stated that Lyons had obtained the records from an agent on a "joint terrorism task force unit." Trial Tr. 71. Later, as trial counsel was cross-examining Lyons, she asked open-endedly why he was interested in investigating Algerians. The Court immediately became concerned that in response to this information, Lyons might disclose information about the "terrorism task force" the prosecutor had mentioned at the earlier sidebar. For this reason, the Court interrupted before Lyons could answer and called for a sidebar. The Court did this not to interfere with Khellil's defense but because it was concerned that trial counsel was about to elicit information that would severely prejudice Khellil before the jury.

In doing so, the Court was not operating based on information that it had obtained from some extra-judicial source or on any sort of concern that Khellil actually had some terrorist connection. Rather, the Court simply remembered what it had been told at the earlier sidebar and was paying attention to what was happening in the courtroom. Trial counsel's rather odd accusation that the Court must have had outside information and/or must have believed that Khellil had some sort of terrorist connection tends to confirm, after the fact, what the Court feared at the time – that counsel had not picked up on what the prosecutor had stated at the earlier sidebar and that she was oblivious to the potentially harmful consequences of the open-ended question she had asked of the government's case agent about why he had gotten interested in Khellil to begin with. The Court notes as an aside that counsel's question to Lyons that preceded the sidebar had no conceivable upside for Khellil's defense.

In any event, contrary to trial counsel's contention in her post-trial motion, the Court *did not* bar her from asking the question or Lyons from answering it. Rather, as

the transcript quite plainly discloses, the Court simply pointed out to trial counsel the potential consequences of what she was doing. *See* Trial Tr. 109-10. Counsel chose, on her own, not to pursue the question after the sidebar.

*The second court-ordered sidebar.* The second time the Court called a sidebar on its own motion took place during trial counsel's cross examination of Grant Vreuls of the Social Security Administration. Vreuls had testified on direct about the Lubrano and Khellil Social Security card applications. Vreuls gave no testimony on direct suggesting that Lubrano and Khellil were one and the same or that he believed Khellil had prepared the Lubrano application. At the outset of her cross, trial counsel asked Vreuls, in an open-ended fashion, whether anything suggested the same person had prepared both applications. The Court called a sidebar not to preclude the question but to ensure that trial counsel was aware of what she was doing and of the possible consequences of asking a government witness an open-ended question of this type with no apparent clue of what the answer would be.

The Court also notes that this second sidebar did not occur in a vacuum. As the trial had progressed through that point, the Court had observed trial counsel repeatedly elicit on cross examination of government witnesses evidence, a good deal of it otherwise inadmissible, that was highly damaging to her client. That by itself would be unremarkable; it is a fact of life of trial practice that a lawyer sometimes elicits evidence that is harmful to his client. But from the Court's observation of the conduct of Khellil's trial counsel, it had become increasingly apparent that she was doing this recklessly, in a manner that reflected an apparent obliviousness to the consequences of her actions. Again, the Court intervened not due to any bias against Khellil, but in an effort to protect

43

his right to a fair trial. And as with the earlier sidebar, the Court did not preclude defense counsel from asking her question; rather, the Court pointed out the potential that the question would elicit testimony harmful to Khellil. Counsel again, on her own, determined not to pursue the question after the sidebar.

Neither of these sidebars took place in Khellil's presence. As a result, there is no basis to say, as trial counsel does, that they reflected an attempt by the Court to interfere with her relationship with Khellil.

*The third incident.* The third incident did not involve a sidebar requested by the Court. Rather, it took place following an objection by the prosecutor. During her cross-examination of ICE fingerprint examiner Kenneth Woods, trial counsel asked him to make an impromptu comparison of an unauthenticated set of fingerprints she said were Khellil's with other fingerprints in evidence and then tried to elicit inadmissible hearsay from Woods regarding what the FBI (a different agency altogether) had responded when she sent the prints to that agency. The Court sustained the prosecutor's foundational objection to the latter question. When trial counsel pressed ahead on the same point, the prosecutor requested a sidebar. The Court excused the jury.

Once the jury was out of the room, the Court criticized counsel's attempt to conduct what amounted to a courtroom experiment via an opposition expert, agreeing with the prosecutor's characterization of counsel's conduct as "reckless." Trial Tr. 446 (prosecutor's comment) & 447 (Court's comment). The Court also stated that it was improper under the rules of evidence to ask a witness to recite the contents of a document that was not in evidence, had not been authenticated, and that counsel said she was not intending to introduce. Trial Tr. 452.

During the course of the discussion after the jury was excused, the Court stated that this episode, "combined with a bunch of other things that have happened in this trial, [lead] me to seriously question whether Mr. Khellil's Sixth Amendment rights are being satisfied in this case." Trial Tr. 447. The Court made further comments in a similar vein. Trial Tr. 447-48. When, after further discussion of the evidentiary issue, trial counsel stated that she had "been grossly insulted in terms of my competency," the Court replied that "I have a responsibility when I see a defendant's Sixth Amendment rights at risk to protect those rights or to do something . . . ." Trial Tr. 455.

The Court's comments most certainly did not reflect any bias against Khellil; again, the Court was attempting to safeguard Khellil's right to a fair trial. Though the Court was critical of counsel, "[j]udicial remarks during the course of trial that are critical or disapproving of, or even hostile to, counsel, parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994). The Court's comments did not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* In addition, because none of the comments took place in the jury's presence, there was no risk of unfair prejudice to Khellil. Nor, finally, did the Court's comments interfere improperly with Khellil's attorney-client relationship. Trial counsel has offered no support for her apparent contention that a judge's criticism of an attorney in the defendant's presence violates the defendant's Sixth Amendment rights.

*Asking a Federal Defender Panel attorney to appear.* After the trial was concluded, the Court asked its courtroom deputy clerk to contact the day's Federal Defender Program "duty attorney" and ask that attorney to come to the courtroom if and

when a verdict was returned. The Court took this step based the totality of trial counsel's performance during the course of the trial. By that time, the Court had observed, over a period of four days, repeated missteps by counsel that led to the admission of evidence damaging to her client, a good deal of it otherwise inadmissible; her apparent inattention to at least some of what took place in the courtroom; her evident obliviousness to the consequences of open-ended questions and other inquiries she had posed on cross-examination; her failure to make proper pretrial expert disclosures regarding handwriting expert Schwid; and the absence of any mention of the materiality issue during her closing argument. These events, taken together, led the Court to believe that Khellil had a viable argument that he had not received the effective assistance of trial counsel. For this reason, the Court wished to ensure that Khellil would have another attorney available to consult with, if he wished to do so, in the event of a guilty verdict.

As the record reflects, the Court did not dismiss trial counsel or advise Khellil to terminate her services. Rather, the Court stated that it wanted "to make sure that Mr. Khellil at least has the opportunity to consult with other counsel in preparing posttrial motions" and made it clear that Khellil was "free to . . . retain [his] own counsel if [he] want[ed] to." Trial Tr. 799. And the Court was most certainly not, as trial counsel rather oddly suggests, trying to get a "more compliant" lawyer on board. Instead, the Court was attempting to be certain that Khellil had competent advice regarding his options.

For these reasons, the Court rejects trial counsel's contention that the Court was biased and that it improperly barred her cross-examination of certain government witnesses.

46

### 3.    Admission of certain records

In her motion for judgment of acquittal, trial counsel contends that the entry /
departure records the government introduced from the former INS and the Department
of Homeland Security were inadmissible as business records.  This objection was
forfeited; counsel did not make it during the trial.  When the government offered these
exhibits (Govt. Exs. ICE 4, ICE 7, and ICE 8), trial counsel stated, "I would ask that my
objection be made after the cross examination of this witness" – the witness being case
agent Lyons, not Madsen, as trial counsel indicates in her motion.[5]  Trial Tr. 86.  The
Court admitted the records subject to a motion to strike.  *Id.*  Trial counsel did not
thereafter renew her objection or move to strike the exhibits.  *See, e.g.,* Trial Tr. 477-78
(review of government's exhibits admitted in evidence).

In addition, the admission of these exhibits was not plain error such that the
Court should have excluded them, or should grant a new trial, even though there was
no contemporaneous objection.  Trial counsel's arguments involve the weight to be
given to this evidence, not its admissibility.  A proper foundation was laid for the
admission of the records.

Trial counsel also contends that the Court should not have admitted photographs
from Illinois Secretary of State and City of Chicago records on the grounds that they
were "potentially misleading and prejudicial."  Mot. for Judg. of Acquittal at 7.  Trial

---

[5]  Trial counsel did object contemporaneously to the admission of another INS
record, Govt. Ex. ICE 5, a form relating to the entry into the U.S. of Khellil's mother, on
the ground that the form had not been filled out completely.  The Court overruled the
objection.  Trial Tr. 93-94.  Trial counsel does not renew that objection in her motion for
judgment of acquittal.

counsel's argument is that

> in identifying Defendant as a perpetrator, the case agent did not compare
> those photographs to any other likely suspects. The use of those
> photographs of one person . . . was tantamount to a "one-on-one" lineup. .
> . . The photos . . . were flagrantly suggestive, and would make the jury
> associate the defendant with the identity of Marco Lubrano raising the
> potential of misidentification and a denial of a defendant's right to due
> process of law.

*Id.* Trial counsel notes that although the Court precluded prosecution witnesses from

comparing the Lubrano and Khellil photos during their testimony, the prosecutor

compared them during closing argument. This, trial counsel contends, "suggested to

the jury that Defendant had committed other acts of falsification to government

agencies," including obtaining driver's licenses, taxi licenses, and a Social Security card

under a false name. *Id.* at 9.

As best as the Court can determine, trial counsel objects to the admission of the

photos on the ground that they were improper "other act" evidence and because they

permitted the prosecutor to argue an identification on something less than a full

photographic array of the type that law enforcement might use in interviewing an

eyewitness to a crime. The latter objection is an odd one, and entirely baseless to boot.

The Court precluded the prosecutor from introducing lay-comparison testimony of the

Lubrano and Khellil photographs. But once the photographs were in evidence, the

prosecutor was entitled to argue that the jury could, in fact, conclude that Lubrano and

Khellil were one and the same. Trial counsel offers no support for her apparent

contention that absent some form of expert "facial recognition analysis," Mot. for Judg.

of Acquittal at 7, the photographs were inadmissible. The comparison that the

prosecutor invited the jury to make is the same sort of comparison that juries make –

appropriately – on a daily basis, for example when they compare a security camera photograph of a bank robber to the physical appearance of a defendant charged with the crime.

Trial counsel's objection that the Secretary of State, City of Chicago, and Social Security records are improper evidence of other crimes comes far too late in the day. No such objection was made, or even hinted at, before or during the trial. Even if trial counsel had made a timely objection, the photographs were properly admissible as evidence of Khellil's alleged plan and of his identity, which are appropriate bases for admissibility under Federal Rule of Evidence 404(b).

Finally, trial counsel objects to the admission of an Illinois Firearm Owner's Identification (FOID) Card application under the name Marco Lubrano. This issue came up at the end of the government's case, when it sought to introduce the application – Govt. Ex. State Police 2 – pursuant to a certification under Federal Rule of Evidence 902(11). Defense counsel said she had "agreed to it in advance, but on second thought, I have to object as to the weight to be given that document." Trial Tr. 465. The Court conducted a sidebar conference. The prosecutor pointed out that another exhibit already in evidence – a driver's license application, Govt. Ex. Ill. Secy. of State 7 – included a reference to a "firearms card" as an item of identification that the license applicant (Lubrano) had used. Trial Tr. 468. (The Court notes that the prior exhibit, including the "firearms card" reference, was admitted without objection by defense counsel, other than the aforementioned objection regarding photographs. *See* Trial Tr. 296-319.) The Court directed the redaction of certain potentially prejudicial information from the FOID application but stated that "[b]ecause there is a reference to a firearms

49

card already in evidence, I don't think that the fact that this is a firearm owner's identification card [application] has any additional unfair probative - - unfair prejudice." Trial Tr. 469.

The Court continues to believe that this ruling was correct. The evidence was admissible to as evidence of identity and plan, and to connect up the reference in the driver's license application. It was no doubt prejudicial, but the prejudice was not unfair and did not substantially outweigh the exhibit's probative value. *See* Fed. R. Evid. 403. And even if its admission was erroneous, any error was harmless.

**4.      The claim of ineffective assistance of trial counsel**

As should be clear from the earlier discussion, the Court is highly doubtful that Khellil's trial counsel rendered the effective assistance to which he was entitled. The Court need not determine that issue definitively, however, because Khellil is entitled to entry of a judgment of acquittal, for the reasons discussed in the following section of this decision.

**5.      Sufficiency of the evidence**

Both trial counsel and substitute counsel have argued that the government failed to prove a false statement on either Count 1 or Count 2. Substitute counsel has also argued that the government failed to prove materiality as to Count 1 or 2; trial counsel has made a similar argument, but only regarding Count 1. (The Court notes that trial counsel failed to argue materiality at all during her closing argument.) In considering Khellil's motion, the Court views the evidence in the light most favorable to the government and asks whether a reasonable jury could have found the elements of the crime beyond a reasonable doubt. *See, e.g., United States v. Hatten-Lubick*, 525 F.3d

50

575, 579 (7th Cir. 2009).

### a.    False statement

The jury was instructed that to find Khellil guilty on the particular count it was considering, it had to find (among other things) that his statement regarding his date of last entry or his statement regarding his place of last entry was false.  As to Count 1, there was a third alleged false statement – that on entry, Khellil was not inspected by an immigration officer.[6]

The government's evidence and argument seemed to be aimed primarily at proving that Khellil had *first* entered the United States long before December 1998 and at a place other than Baltimore.  Though the government offered a significant amount of evidence on that point, Khellil was not charged in the indictment with making false statements about when he *first* entered the United States.

More importantly, there was no necessary, or even apparent, inconsistency between the proposition that Khellil had first entered the U.S. before December 2008 and the charged statements about his date and place of last entry.  In particular, there is no reason why a person who had first entered the U.S. before 1998 could not leave the country and then return, for the last time, at Maryland in December 1998.

The government presented no evidence that anyone saw Khellil in this country in

---

[6]  The AR-11 form, on its face, required only disclosure of the "date of entry" and "place of entry," not the date and place of *last* entry.  The jury was instructed without objection by the government, however, that to convict on Count 2, it had to find beyond a reasonable doubt that Khellil made false statements about his place of last entry or his date of entry.  The latter phrase was ambiguous and almost certainly was read by the jury as requiring proof of a false statement about the date of *last* entry; that is the way the case was argued by both sides.

December 1998 or even shortly before that time or that anyone who continued to live with Khellil up through that date could attest that he was here. Nor did the government present evidence indicating that Lubrano / Khellil was actually at work (at the Zam Zam restaurant or driving a taxi) in December 1998 such that he could not have left the country and returned at that time. Nor did it provide evidence that directly tended to undercut Khellil's story that he had stowed away and come ashore in Baltimore; indeed, the only evidence directly addressing that point was an exhibit that showed there actually was a ship from Algeria that was docked in Baltimore at the relevant time.

The government's only direct evidence regarding whether Marco Lubrano or Khellil had remained in the country involved the records regarding departures by aliens, which showed no departures by Marco Lubrano or Abderrahmane Khellil from 1982 through 2008. But the government's witness readily conceded that the government's recordkeeping was, at best, spotty during the relevant period and that the records could not be considered complete reports of departure information by any stretch of the imagination.

As a result, the government had to rely primarily on circumstantial evidence that Khellil had not left the country. This consisted largely of the fact that Khellil obtained Chicago taxicab licenses under the Lubrano name on a yearly basis, including in July 1998; lived in an apartment on the north side of the city during that period; and evidently (based on the statements on the Zam Zam web site) ran a restaurant during that period. None of this, however, was in the least bit inconsistent with Khellil having left the country and then returned: thousands of people live and work regularly in this country and also travel abroad. The government also showed that the immigration

authorities had no record of further entries to the U.S. by Marco Lubrano after 1993 –
but that, too, was in not inconsistent with Khellil's story on his asylum application that he
had come into the country as a stowaway in December 1998.

Defense counsel elicited – contrary to her client's interests – what amounted to
opinion testimony by ICE agent Lyons and USCIS supervisor Madsen to the effect that
the circumstantial evidence tended to show that Lubrano / Khellil had not left the
county.  *See* Trial Tr. 119-20 & 140 (Lyons) & 234-35 (Madsen).  But although this
testimony amounted to mini-closing arguments of sorts on the issue of proof of falsity, it
added little to the evidentiary basis for the charges against Khellil.

The government's theory of the case was that Khellil told a series of lies on his
asylum application – regarding not only his date and place of last entry, but also the
absence of earlier entries and his omission of Chicago addresses – and then had to
repeat these same lies on the two documents at issue to avoid discovery.  Though that
theory of why Khellil repeated the same (or almost the same) information about his date
and place of last entry was certainly supported by the evidence, it did not bear on the
question of whether Khellil had misstated not just his date of *first* entry but also his date
of *last* entry.  The Court reaches a similar conclusion regarding something the
government pointed out for the first time in its response to the post-trial motions – the
fact that the last renewal of the Lubrano taxi license took place in Chicago in July 1998,
a month when Khellil claimed in his asylum application that he was being persecuted in
Algeria.  *See* Govt.'s Resp. to Def.'s Mot. at 4.  That might tend to show that Khellil's
story of persecution was false, but it does not tend to show that his statements on the I-
485 and AR-11 forms that he last entered the U.S. in December 1998 were also false.

For these reasons, the Court concludes that the government failed to offer evidence from which a reasonable jury could find beyond a reasonable doubt that Khellil made false statements about his date and place of last entry into the U.S.  The same is true of his statement on the I-485 form, charged in Count 1, that his last entry was without inspection by a U.S. immigration officer.

b.    **Materiality**

Though the Court has determined that the government provided insufficient evidence to prove falsity, an essential element of each of the charges, the Court will also address whether the government provided evidence from which a reasonable jury could find that the alleged false statements were material.

A false statement is material under 18 U.S.C. § 1001 if it has a natural tendency to influence or is capable of influencing the decision of the decision-making body to which it is addressed.  *United States v. Gaudin*, 515 U.S. 506, 509 (1995). Determination of whether a statement is material involves two subsidiary questions of fact:  "(a) 'what statement was made?'; and (b) 'what decision was the agency trying to make?."  *Id.* at 512; *see also, United States v. Gant*, 119 F.3d 536, 539 (7th Cir. 1997) (perjury case).

*Count 2.*  No reasonable jury could find that the government proved that Khellil's alleged false statements on the AR-11 change of address form was material to *any* decision.  There was no evidence identifying any "decision" for which the form is used other than, perhaps, where to send communications.  In that regard, the only thing on the form that the evidence arguably indicated might be material is the address itself. There was no evidence that the immigration authorities use the "date of entry" and

54

"place of entry" statements on the form for any purpose at all.

In responding to Khellil's motions, the government emphasizes that the AR-11 form collects information required by law and that failure to report a change of address is punishable by a fine, imprisonment, or removal from the country. *See* Govt. Resp. at 6. Though true, that is beside the point. Were this enough to render a false statement material, every false statement on a required government form would, by definition, be material. That is not the law.

The government also contends that the statement was material because it "continued the lies" that Khellil allegedly told on his asylum application and his application for adjustment of status. Again, this is beside the point. The test for materiality is whether the statement could have some effect on a decision by the agency to which the statement was addressed. The notion that Khellil may have been continuing a cover-up of an earlier false statement does not advance the proposition that the purported false statements on change of address form had anything to do with any decision the agency was called upon to make.

In sum, the government failed to offer evidence from which a reasonable jury could conclude that the "date of entry" and "place of entry" information on the AR-11 address form was material.

*Count 1.* The primary other allegedly false statements were the "date of last arrival" and "place of last entry" statements that Khellil made on his I-485 application for adjustment of status. The I-485 form is used to determine whether an alien is granted permanent resident status.

Chicago Asylum Office director Madsen – whose office, it is worth pointing out,

does not decide I-485 applications – testified that an I-485 application by a person previously granted asylum is compared with the person's asylum application. Madsen testified that if the two contain inconsistent information on a matter that goes to the person's eligibility for asylum, the asylum file would be sent to the asylum office "for review for possible termination." Trial Tr. 204. He testified that "we're going to get that file sent back to us for review, and they're not going to be granted permanent residence until our review is complete." *Id.*

Madsen did not testify, however, that such a discrepancy would prevent the I-485 applicant from obtaining permanent resident status. In particular, Madsen was not asked, nor did he testify, that after completion of the applicant's review in the situation he described, the I-485 application would be subject to denial.[7]

In sum, the government offered no evidence from which a reasonable jury could find that Khellil's alleged false statements on his I-485 application regarding his date and place of last entry could have had any effect on the immigration authorities' decision whether to grant the I-485 application. It therefore failed to prove that those statements were material.

The last false statement in Count 1 was Khellil's statement in the I-485 application that at his last entry, he was not inspected by a U.S. immigration officer. The government's evidence of materiality regarding this statement suffered from the same deficiencies as its evidence regarding the other statements.

---

[7] Indeed, it is questionable whether Madsen, given his assignment to asylum matters, would have been competent to testify about how a separate agency of DHS would deal with applications for adjustment of status.

The Court also notes that in addition to the points it has made regarding the materiality issue, there is considerable tension between the government's materiality argument and the definition of materiality provided in *Kungys v. United States*, 485 U.S. 759 (1988). Though *Kungys* was a case involving a non-criminal immigration matter, the definition of materiality is, generally speaking, common to civil and criminal law, and the Supreme Court has cited *Kungys* in discussing what materiality means in the criminal context. *See Neder v. United States*, 527 U.S. 1, 16 (1999); *United States v. Wells*, 519 U.S. 482, 489-90, 499 (1997); *Gaudin*, 515 U.S. at 509.

In *Kungys*, the government contended that an applicant for naturalization made false statements about his date and place of birth in his naturalization petition that were inconsistent with what he had said in an earlier visa application. The Court determined that those facts were not material because they were not pertinent to the applicant's qualifications for citizenship, even if the inconsistency would have resulted in a high probability of an investigation about whether he had been eligible for a visa in the first place. *Id.* at 775.

The same is true in this case. The government offered no evidence that Khellil's statements about the circumstances of his last entry into the U.S. were pertinent to whether he should be granted permanent resident status. And the AR-11 change of address form was submitted long after both Khellil's asylum application and his application for adjustment of status had been adjudicated; it had no relationship to any decision the immigration authorities were called upon to make about him.

The Court notes in closing that the government's evidence arguably showed that Khellil made false statements on his asylum application – a question that is not before

the Court and that the Court thus does not decide. If that is so, however, the government is not without a remedy: it can seek to revoke the grant of asylum (a process that, according to the evidence, is already underway).

### Conclusion

For the reasons stated above, the Court grants defendant's motion for judgment of acquittal [docket nos. 94 & 76]. All other motions are terminated [docket nos. 55 & 70]. The Clerk is directed enter judgment finding the defendant not guilty on all charges.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  December 28, 2009